# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| ROBERT CHAMBERS, | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) 2:10-cv-12-WTL-MJD |
| | ) |
| DR. MICHAEL MITCHEFF, et al., | ) |
| | ) |
| Defendants. | ) |

## Entry Discussing Motion for Summary Judgment

Plaintiff Robert Chambers ("Chambers") has been incarcerated at the Wabash Valley Correction Facility ("WVCF") at all times relevant to this complaint. Chambers voluntarily dismissed his claim against defendant Rose Vaisvilas on July 26, 2011. Chambers alleges that the remaining two defendants, Dr. Michael Mitcheff and Dr. Alfred Talens were deliberately indifferent to his serious medical needs. These defendants seek resolution of Chambers' claims through the entry of summary judgment.

For the reasons explained in this Entry, the remaining defendants' motion for summary judgment [69] is **granted.**[1]

## I. Summary Judgment Standard

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the *Federal Rules of Civil Procedure*. A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.* "The applicable substantive law will dictate which facts are material." *National Soffit & Escutcheons, Inc., v. Superior Systems, Inc.,* 98 F.3d 262, 265 (7th Cir. 1996) (citing *Anderson,* 477 U.S. at 248). The court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011).

---

[1] Chambers requests that the court strike his deposition from the record because the defendants failed to seek leave to take his deposition in accordance with Rule 30 of the *Federal Rules of Civil Procedure*. His request is **denied** because leave was granted for the defendants to take his deposition. *See* Order of May 18, 2011 [docket #56].

## II. Discussion

*A.  Undisputed Facts*

On the basis of the pleadings and the expanded record, and specifically on the portions of that record which comply with the requirements of Rule 56(c), the following facts, construed in the manner most favorable to Chambers as the non-movant, are undisputed for purposes of the motion for summary judgment:

At all relevant times, Dr. Talens was a treating physician at the WVCF. He was licensed to practice medicine in the State of Indiana in 1979, and his specialty was general surgery. Dr. Talens first examined Chambers on May 8, 2008, for complaints of abdominal pain. Dr. Talens ordered fecal occult blood stool tests and prescribed Metamucil, Milk of Magnesia, and Colace, all of which are medications to relieve constipation. The stool was negative for occult blood. Chambers saw Dr. Talens again on May 17, 2008, because his pain had continued and spread to his groin, and the medications were not helping. No changes in medication were made. On June 26, 2008, Dr. Talens ordered an x-ray of Chambers' abdomen. The results showed evidence of constipation with no abnormal intra-abdominal calcifications and no evidence of obstruction.

Chambers saw Dr. Talens again on July 22, 2008, because the pain had worsened and the laxatives were not working. Dr. Talens examined Chambers for abdominal pain and determined that the stool occult blood tests had returned positive for blood in his stool two out of three times. Dr. Talens submitted a consultation request for an air contrast barium enema.

At all relevant times, Dr. Mitcheff was the Regional Medical Director for Corizon, Inc., f/k/a Correctional Medical Services, Inc. Dr. Mitcheff has practiced medicine since 1987, and his specialty is emergency medicine. After reviewing the consultation request, Dr. Mitcheff suggested an alternative treatment plan consisting of further diagnostic testing, i.e. additional fecal occult blood tests, to confirm the need for an air contrast barium enema before proceeding with the requested enema. Dr. Mitcheff recommended that Dr. Talens submit a follow-up consultation request depending on the additional test results.

On August 3, 2008, Chambers requested to see a nurse and an appointment with the doctor because he was still having pain and a lot of trouble defecating. He also submitted a written request to find out whether the barium enema had been approved. On August 4, 2008, a written response was issued to Chambers stating that his request had been "deferred" and that "alternative treatment" was recommended.

On July 25, 2008, Dr. Talens ordered follow-up fecal occult blood tests every week for one month. On August 16 and August 20, 2008, Chambers submitted requests to see the doctor because his pain was worse. On August 20, 2008, Dr.

Talens saw Chambers for complaints of "lots of left upper abdominal pain" and "lots of mucous with stools." No medications were prescribed at this time. Dr. Talens submitted another request for an air contrast barium enema. The request described Chambers' symptoms as on and off left upper abdominal pain for months, mucous with bowel movements, pain sometimes colicky and lasted for an hour or two, regular bowel movements, denied diarrhea and constipation, stool negative hemoccult, and an unremarkable abdominal and rectal exam.

On August 20, 2008, Dr. Mitcheff denied Dr. Talen's second consultation request. Dr. Mitcheff denied the barium enema request and recommended that Dr. Talens continue to follow Chambers conservatively on-site. Dr. Mitcheff also recommended that Dr. Talens perform a digital rectal examination or an anoscope. Dr. Mitcheff indicated that if there was a change in symptoms, the request could be resubmitted.

On September 16, 2008, Chambers submitted a sick call request because the abdominal pain and dizziness he had been experiencing since October 2007 was worse. Chambers saw Dr. Talens on September 18, 2008. The chart notes that his stool was negative for occult blood. Dr. Talens suggested that Chambers increase his activity level, increase his fluid intake, and use a warm compress. He told Chambers that the State was refusing his requests and he suggested that Chambers keep a journal of his symptoms. Dr. Talens saw Chambers again on September 23, 2008. Dr. Talens noted a long history of left sided abdominal pain. A stool occult blood test was ordered.

Chambers requested an appointment with a doctor on October 5, 2008. He was seen by Dr. Talens on October 10, 2008. Dr. Talens prescribed Colace and Metamucil and increased fluid intake. On October 24, 2008, Chambers requested medical assistance because for a year he had been in pain and experienced dizziness and constipation but had not yet been given a diagnosis. On October 28, 2008, Chambers saw Dr. Talens. The medications were continued.

On January 10, 2009, Chambers submitted a request for health care, stating that he was still having the same abdominal pain and dizziness that he had experienced since October 2007. Dr. Talens examined Chambers on January 12, 2009. Chambers reported left lower abdominal pain for about a year, everyday lately. He also reported some blood with stools. Another fecal occult blood test was completed. Dr. Talens examined Chambers again on February 9, 2009. No medications or additional tests were ordered. Dr. Talens told Chambers he could not do anything more.

On March 2, 2009, Chambers began seeing Dr. Rogan. Chambers reported that during the past five months he had increasing abdominal girth but no weight gain. Dr. Rogan suspected irritable bowel syndrome ("IBS"). On April 1, 2009, Dr. Rogan examined Chambers, noting that there had been no change in symptoms. Dr. Rogan did not find any distension, and he noted that the previous diagnoses of

"gastrointestinal hemorrhage" and "blood in stool" appear to have been based on history and not borne out by physical or laboratory tests. He prescribed a new medication, magnesium citrate.

On April 24, 2009, Dr. Rogan prescribed Toradol and Pamelor. On June 23, 2009, Dr. Rogan noted that he had been treating Chambers as having IBS, but usual treatments had been ineffective thus far. Dr. Rogan noted that a "GU exam" was normal and there was no hernia visible or palpable. He further noted that the hemoccult blood stool tests had been negative 3 times out of 3 per EMR lab results, but there was a physician note from July 22, 2008, stating that the results were positive 2 times out of 3. Dr. Rogan examined Chambers nine times over fifteen months. Dr. Rogan tried medications for IBS but none of them helped. On June 23, 2009, Dr. Rogan submitted a consultation request for a CT scan of Chambers' abdomen and pelvis.

On June 24, 2009, Dr. Mitcheff reviewed Dr. Rogan's consultation request and agreed with Dr. Rogan that a CT scan of Chambers' abdomen and pelvis was medically warranted. On July 22, 2009, Chambers received the CT scan, which returned clinically unremarkable as to the abdomen. The CT scan of the pelvis revealed the possibility of a small amount of free fluid in the lower pelvis. The CT scan of the pelvis was otherwise clinically unremarkable.

Chambers was admitted to the infirmary for skilled care on August 13, 2009, for further workup, last tests, observation, and treatment of abdominal pain. Dr. Rogan noted that Chambers' condition was negative for diarrhea, nausea, vomiting, weight loss, distention, abdominal tenderness, hernia, or palpable masses. New medications, Hyomax-sr and Fibercon, were prescribed. Chambers was discharged to the general population on August 17, 2009.

On August 20, 2009, Dr. Rogan reviewed the benign CT and laboratory findings with Chambers. Dr. Rogan discussed with Chambers the possibility of the symptoms being exacerbated by psychological stress, but Chambers denied any particular anxiety over the past 15 months and preferred to avoid psychotropic medications. Hyomax-sr was continued and Fibercon was discontinued. Again on September 30, 2009, Dr. Rogan noted that a GU exam was normal and there was no hernia visible or palpable. Hyomax-sr was continued and Fibercon was started again.

On November 30, 2009, Dr. Mitcheff and Dr. Rogan discussed Chambers' treatment plan and both physicians agreed to proceed with an air contrast barium enema. On December 24, 2009, Chambers reported to Dr. Rogan that the Levbid (Hyomax-sr) had not been helpful and that the full sensation he felt now involved the left testicle and left lung, and it felt worse worst after ingestion of food and water. Chambers continued to resist taking meds with psychotropic effects. The medications, Fibercon and Hyomax-sr, were stopped.

On March 10, 2010, Chambers continued to report abdominal pain radiating to testicles and lungs. It was often worse after eating and drinking, but not always. Dr. Rogan noted that workup to this point had included CT scans, stool studies, blood work, CXR, and multiple physical exams, all without clear diagnosis. Dr. Rogan continued to believe that IBS was most likely involved. Chambers continued to decline antidepressant medications for stress. On March 24, 2010, Chambers received an air contrast barium enema, which returned negative for any obstructions, polyps, abnormalities, lesions, or masses.

On June 4, 2010, Dr. Rogan examined Chambers for complaints of scrotal pain. Dr. Rogan noted that Chambers had reported lower abdominal pain for approximately two years without diagnosis despite labs, stool studies, CT, and barium enema. On examination, there were no abnormal masses or hernia. Chambers declined pain medication. Dr. Rogan ordered scrotal support for Chambers and submitted a request for a testicular ultrasound. Dr. Mitcheff approved the testicular ultrasound due to Chambers' complaints that his abdominal pain had started to radiate down into his testicles. The bilateral testicular sonogram was performed at the Sullivan County Community Hospital and it returned "normal."

On August 28, 2010, Dr. Mitcheff reviewed a consultation request from Dr. Michael Person, a treating physician at WVCF, for Chambers to receive a colonoscopy. Dr. Mitcheff agreed that the colonoscopy was medically warranted. On October 14, 2010, a colonoscopy was performed at the Regenstrief Health Center. The physicians removed a small, non-cancerous polyp from Chambers' colon during the colonoscopy. They opined that the polyp was likely not the cause of constipation and pain.

On October 20, 2010, Dr. Stoller examined Chambers at WVCF, noting that the total colonoscopy had returned normal. His notes indicate an assessment of a femoral hernia and marked tenderness in left femoral canal area. He noted that he would seek approval for surgery at Wishard Hospital. There is no indication in the record that such approval was requested.

On January 20, 2011, Chambers saw Dr. Talens. Dr. Talens noted that Chambers had been complaining of left groin pain for years and that it was getting worse. The pain was worse when Chambers walked and it went away when he laid down. Chambers reported that he had been told by a doctor that he had a hernia. Dr. Talens' examination was "unremarkable." Dr. Talens ordered an x-ray of Chambers' abdominal cavity. The x-ray returned "negative," with the comment that "further evaluation of an inguinal hernia should be based on clinical judgment."

Chambers saw Dr. Talens again on February 9, 2011. Dr. Talens requested a CT scan of the left groin area. In his request, Dr. Talens reported that Chambers' pain was consistently at the left groin, compatible with a hernia, but examinations by several examiners had been repeatedly negative. Dr. Talens indicated that this

was "highly suspicious of rare hernia," a Spigelian hernia. That same day, Dr. Mitcheff approved the CT scan of the left groin area. The CT scan was performed on March 7, 2011. The impression was "normal CT of the abdomen and pelvis." The report indicated that there was no Spigelian hernia and no inguinal hernia.

On March 9, 2011, Dr. Talens requested a general surgical consultation for Chambers' left groin pain at Wishard Memorial Hospital. Dr. Mitcheff approved the surgical consult. On April 12, 2011, Chambers presented to Wishard Memorial Hospital for his consultation. The Wishard Hospital physicians physically examined Chambers and reviewed the Sullivan County Community Hospital CT scan of the abdomen and pelvis. They found no hernia. Surgery was not recommended for Chambers. The physicians recommended stool softeners, to be evaluated in the pain clinic, and a return visit if he developed a hernia. Otherwise, they reported that his care should be dictated by his regular physicians.

Dr. Talens saw Chambers after his surgery consult on April 12, 2011. Chambers told Dr. Talens that when he was seen at Wishard Hospital, one young doctor, Dr Gayed, examined him and diagnosed him with a femoral hernia, but then an older doctor, Dr. Gomez, examined him differently and said he had no hernia. The "dictating" physician, Dr. Gayed, and "staff" physician, Dr. Gomez, reported in writing "[n]o hernias noted on examination or on imaging." Dr. Talens recommended continuation of local treatment with warm compress and that Chambers write in a diary the course of his symptoms. He recommended a reevaluation in the future and/or getting a second opinion.

Chambers saw Dr. Talens again on May 18, 2011. Dr. Talens requested another general surgery consultation for a second opinion. Dr. Talens retired in late May of 2011. Chambers submitted a written request for health care on June 28, 2011, to find out if Dr. Talens' request for a specialty consultation was approved. The response of health care staff was "onsite treatment."

### B. Analysis

At the time of his confinement at the WVCF, Chambers was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment=s proscription against the imposition of cruel and unusual punishments. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish a medical claim that a prison official has violated the Eighth Amendment,

a plaintiff must demonstrate two elements: (1) an objectively serious medical condition; and (2) deliberate indifference by the prison officials to that condition. *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006).

"[A]n objectively serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 584-85 (internal quotation omitted). The defendants do not dispute that Chambers had an objectively serious medical condition.

As to the second element, "[t]o show deliberate indifference, the plaintiff must demonstrate that the defendant was actually aware of a serious medical need but then was deliberately indifferent to it." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). For a medical professional to be liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain v. Wood,* 512 F.3d 886, 895 (7th Cir. 2008) (internal quotation omitted); *see also Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006). "Deliberate indifference is more than negligence and approaches intentional wrongdoing." *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006) (internal quotation omitted). "[D]eliberate indifference is essentially a criminal recklessness standard, that is, ignoring a known risk." *Id.* (internal quotation omitted). "Even gross negligence is below the standard needed to impose constitutional liability." *Id.* (internal quotation omitted).

    1.    *Dr. Mitcheff*

The claim against Dr. Mitcheff is that he was responsible for Chambers' lack of medical treatment. Chambers alleges in his complaint that Dr. Mitcheff denied requests for tests, colonoscopies, enemas, and MRIs that had been submitted by prison physicians on April 30, 2008, July 21, 2008, August 20, 2008, September 10, 2008, March 2, 2009, April 14, 2009, June 8, 2009, and September 30, 2009. Chambers alleges that Dr. Mitcheff's repeated and continuing denials of examining doctors' orders show a pattern of reckless disregard for Chambers' serious medical needs.

Chambers' allegations misstate the record. There were no requests submitted to Dr. Mitcheff by any physicians for any special tests on April 30, 2008, September 10, 2008, March 2, 2009, April 14, 2009, June 8, 2009, or September 30, 2009.  On July 23, 2008, Dr. Mitcheff did review a request for approval submitted by Dr. Talens for Chambers to receive an air contrast barium enema. Dr. Mitcheff denied this request and recommended that additional fecal occult blood stool tests first be performed to confirm the need for the enema. On August 20, 2008, Dr. Mitcheff reviewed a second request from Dr. Talens for the air contrast barium enema. Dr. Mitcheff denied the request and recommended that Dr. Talens consider performing

an anoscope or a digital rectal examination. Dr. Mitcheff also noted that if Chambers' symptoms changed, Dr. Talens should submit another consultation request. On September 18, 2008, Chambers' stool was negative for occult blood.

On June 24, 2009, Dr. Mitcheff approved a consultation request for Chambers to receive a CT scan of his abdomen and pelvis. The CT scan was clinically unremarkable except for a small amount of free fluid in the lower pelvis, which Dr. Rogan considered to be benign. On November 30, 2009, Dr. Mitcheff discussed Chambers' condition with Dr. Rogan and Dr. Mitcheff approved an air contrast barium enema. The air contrast barium enema was not performed until March 24, 2010, but there is no evidence that Dr. Mitcheff delayed the enema in any way. The results were negative for any polyps or other abnormalities.

In June 2010, Dr. Mitcheff approved a consultation request for Chambers to receive a testicular ultrasound. The ultrasound was performed at a local hospital and it returned "normal." In August 2010, Dr. Mitcheff approved a consultation request for Chambers to receive a colonoscopy. The physicians who performed the colonoscopy removed a small, non-cancerous polyp from Chambers' colon. The physicians opined that the polyp had not caused Chambers' constipation and pain.

In February of 2011, Dr. Mitcheff approved a consultation request from Dr. Talens for Chambers to receive a CT scan of his left groin area. The results of the CT scan of the abdomen and pelvis were "normal." In March of 2011, Dr. Mitcheff approved a surgical consultation submitted by Dr. Talens. Chambers was seen in the surgical clinic at Wishard Memorial Hospital and the physicians found no hernia and recommended that Chambers not have surgery.

As is clear from the above time-line, Dr. Mitcheff did not, in fact, demonstrate a pattern of reckless disregard for Chambers' serious medical needs. If anything, Dr. Mitcheff exhibited a pattern of approving various outside tests in an effort to diagnose the cause of Chambers' pain. The initial two requests for an air contrast barium enema were reviewed and conservative treatment measures and confirming tests were recommended instead. A prisoner's dissatisfaction with a certain course of treatment does not support an Eighth Amendment violation unless the medical treatment was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" the prisoner's condition. *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir.2007). There is no evidence that Dr. Mitcheff did not exercise reasonable medical judgment in responding to the first two requests for the barium enema. Thereafter, Dr. Mitcheff approved a number of tests, including an ultrasound, a colonoscopy, CT scans, and an air contrast barium enema. Finally, he approved a surgery consult with an outside hospital, and the surgeons concluded that surgery was not recommended. "We examine the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs." *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000). The totality of care approved by Dr. Mitcheff negates any inference of deliberate indifference.

Chambers further alleges that Dr. Mitcheff denied a request for surgery submitted by Dr. Stoller on October 20, 2010. The chart cited by Chambers is an examination by Dr. Stoller after a colonoscopy was performed and returned normal. Dr. Stoller indicated that he "will seek approval for a surgical consult at Wishard." Chambers argues that Dr. Mitcheff has failed to include in his affidavit any mention of Dr. Stoller's surgical consultation request and that therefore, a jury could infer that Dr. Mitcheff was aware of the request and of Chambers' pain, but merely chose to ignore both.

Contrary to Chambers' suggestion, there is no evidence that a surgical consultation request was actually prepared by Dr. Stoller and received by Dr. Mitcheff. There can be no inference made as to Dr. Mitcheff's lack of response to a surgical request which apparently was not submitted.

Chambers next argues that Dr. Mitcheff denied Dr. Talens' second request for a surgical consultation in May of 2011, and instead recommended "on-site treatment," knowing that "on-site treatment" amounted to "no treatment at all." Chambers supports this contention with Dr. Talens' deposition testimony that he had "no idea" what "on-site treatment" would include. As explained by Dr. Talens in his deposition, his May 18, 2011, request for surgical consultation was one for a second opinion, submitted after Chambers was seen at Wishard Hospital on April 12, 2011. The April 12, 2011, report indicated that no hernias were noted on examination or on imaging. The surgical physicians, Dr. Gayed and Dr. Gomez, indicated that if a hernia developed, Chambers should be re-evaluated by them at that time. Otherwise, no follow-up was needed in the surgical clinic. Docket #72-6, Exhibit 25.

First, there is no evidence of record that Dr. Mitcheff reviewed a request for a second opinion. The only record of a response to such a request, if it was submitted, is the response to Chambers' request for health care in which he asked if Dr. Talens' request for a general surgery consult had been approved. A nurse signed the response from the Health Care Staff, merely stating "on-site treatment." These circumstances do not amount to deliberate indifference on the part of Dr. Mitcheff. Absent evidence that Dr. Mitcheff denied the request for a reason other than one based on the exercise of his professional judgment, there is no genuine issue of material fact on this issue. Moreover, even if the court were to infer that Dr. Mitcheff did review and deny a request for a second surgical opinion, there was no additional evidence in the record that would support a finding that in denying the request Dr. Mitcheff ignored "a known risk" that Chambers had a hernia. The initial consult indicated that Chambers should be re-evaluated "if a hernia developed." No diagnosis of a hernia was made between April 12, 2011, and May 18, 2011. These circumstances do not create a genuine issue of fact as to whether Dr. Mitcheff was deliberately indifferent to Chambers' serious medical needs, including any need for surgery.

Chambers also makes much of an email that was produced inadvertently in discovery. The email, dated March 31, 2011, was sent by Dr. Mitcheff to his attorneys, stating that Chambers "just had another NORMAL CT SCAN. This guy is like a woman walmart employee trying to cash in." Chambers argues that this email proves that Dr. Mitcheff was indifferent toward Chambers' medical needs. Dr. Mitcheff responds that the email merely confirms that he continued to monitor Chambers' condition and he had approved appropriate treatment and consultations with outside providers, even though no testing had revealed the presence of a hernia. Dr. Mitcheff describes his remark about Walmart as revealing his frustration with a lawsuit brought against him for failure to treat a hernia when there was no hernia. The report of normal test results and a flippant remark to counsel is not sufficient evidence to support any inference of indifference on the part of Dr. Mitcheff. Rather, his professional judgment was exercised in reviewing each of the requests for outside consultations, and there is no evidence that Dr. Mitcheff ignored a "known risk."

Certainly it is reasonable for Chambers to feel frustrated with the fact that the medical providers and numerous tests that were performed failed to determine a diagnosis that explained his pain. Although the physicians were unable to diagnose or cure Chambers' pain, this does not by itself establish deliberate indifference. When "a physician provides constitutionally acceptable care, his or her inability to effect a final cure is not proof of deliberate indifference." *Glass v. Rodriguez*, 417 F.Supp.2d 943, 948 (N.D. Ill. 2006)(citing *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir.1996)).

    2.    Dr. Talens

As to the claim against Dr. Talens, Chambers alleges that when Dr. Talens submitted requests for approval for tests to help diagnose Chambers' symptoms, Dr. Talens misrepresented facts concerning his condition. Chambers alleges that this contributed to the repeated denials for the tests. Chambers also alleges that Dr. Talens insisted to Chambers that his symptoms did not exist. Chambers contends that Dr. Talens' actions show an actual intent to keep Chambers from knowing the truth about his condition and from receiving medical treatment to relieve his pain and suffering.

Dr. Talens treated Chambers for abdominal pain from May 8, 2008, through February 9, 2009, and again from January 20, 2011, through May 18, 2011. During the earlier segment of that time, Dr. Talens examined Chambers at least ten times. Dr. Talens ordered an x-ray which revealed no obstructions or abnormalities. On two occasions, Dr. Talens requested an air contrast barium enema. Dr. Talens prescribed Colace (stool softener), Matamucil (laxative), and Milk of Magnesia. He ordered fecal occult blood tests to determine whether there was blood in Chambers' stool. From January 20, 2011, through May 18, 2011, Dr. Talens examined Chambers at least four times. During that time, Dr. Talens ordered an x-ray, CT scan, surgical consult, and a request for a second opinion.

Dr. Talens asserts that since May of 2008, Chambers received 50 physician examinations, 90 nursing examinations, numerous blood stool tests, x-rays of his abdomen, CT scans of his abdomen and pelvis, an air contrast barium enema, an ultrasound, a colonoscopy, three separate admissions to the infirmary for observation and monitoring, numerous consultations with outside providers, and numerous medications. Dr. Talens argues that this abundance of care negates any claim of deliberate indifference.

Chambers concedes that Dr. Talens did not completely ignore his medical needs, but he contends that the treatment decisions made by Dr. Talens evidence a substantial departure from professional judgment. Chambers asserts that none of the treatment provided by Dr. Talens alleviated his pain. Chambers argues that Dr. Talens continued to prescribe Metamucil, Milk of Magnesia, and Colace for constipation at times when he knew it was ineffective and Chambers' pain had worsened. This, he argues, shows deliberate indifference.

Chambers is correct in his contention that the mere fact that prison medical providers examined him numerous times and ran a number of diagnostic tests does not, in and of itself, preclude a finding of deliberate indifference. It is also true, however, as noted above, that the fact that the providers' treatment failed to cure Chambers' condition does not prove the existence of deliberate indifference. Whether Dr. Talens was deliberately indifferent to Chambers' serious medical needs turns on a closer examination of his responses to Chambers' complaints.

None of the tests ordered by Dr. Talens revealed a hernia or any abnormal findings. Dr. Talens did not record that he had ever found a hernia or other abnormality on examination. Surgery was not recommended. Regardless of what Dr. Talens believed with regard to Chambers' symptoms, he responded to Chambers' complaints by prescribing medications and a number of diagnostic tools in an effort to discover the cause of Chambers' pain. Dr. Talens noted the fact that Chambers had sought treatment for months/years and that the pain was getting worse. Dr. Talens noted how Chambers' pain increased when he walked. On February 9, 2011, Dr. Talens noted his suspicion that the cause might be a Spigelian hernia, but that, too, was ruled out upon further imaging. These are not circumstances that give rise to an inference of deliberate indifference. Dr. Talens did not ignore Chambers' complaints. Each time Dr. Talens saw Chambers, he responded with some type of prescription, recommendations, and/or requests for additional diagnostic tests. "Mere medical malpractice or a disagreement with a doctor's medical judgment is not deliberate indifference." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007).

Chambers argues that he was diagnosed as having a hernia but was never provided meaningful treatment. Chambers points out that his medical expert, Dr. Schultheis, opined on July 28, 2011, that Chambers had been diagnosed with a femoral hernia. Dr. Schultheis had not examined Chambers, but after reviewing the

medical records, he stated that Chambers "was recently diagnosed with a femoral hernia after a four year history of complaints and requests for medical treatment." Chambers also asserts that Dr. Stoller diagnosed a hernia on October 20, 2010, and Dr. Talens diagnosed a hernia on January 20, 2011, and February 9, 2011. The defendants contend that Dr. Talens never did diagnose a hernia. They also argue that if Chambers truly did have a hernia, it would have been confirmed when he was seen at Wishard Memorial Hospital on April 12, 2011, but the physicians there found no hernia. Dr. Gayed, the treating physician at Wishard Memorial Hospital was deposed for this case and stated that based on a CT scan and physical examination, Chambers did not have an inguinal or femoral hernia on April 12, 2011. Dr. Schultheis's statement in July of 2011 that Chambers had been "recently diagnosed with a femoral hernia" is arguably not supported by the records that he reviewed.

Moreover, whether Chambers had a hernia is not the dispositive point in this case. The issue is whether the defendants were deliberately indifferent to Chambers' medical needs, not whether they properly diagnosed a particular condition. Indeed, even if Chambers was misdiagnosed, Chambers might have shown negligence, but under these circumstances, he has not shown that a genuine issue of fact exists as to whether the defendants were deliberately indifferent to his serious medical needs.

Chambers argues that the defendants deliberately ignored his pain and failed to treat it. The record simply does not reflect that the defendants, or any other prison medical staff, ignored Chambers' pain. Chambers was admitted to the infirmary for a week in 2009 where he could be closely monitored and given additional medications for his symptoms. Chambers chose not to try antidepressant medications for stress, as suggested by Dr. Rogan in 2009 and 2010. In June of 2010, Chambers declined pain medication. The other numerous examinations and tests that were performed on Chambers have been discussed at length.

As a final point, Chambers' medical expert Dr. Schultheis opined that the failure to timely diagnose a femoral hernia and to surgically correct it fell below the reasonable standard of care for a physician practicing medicine in the State of Indiana from 2007 to the present. The defendants have submitted correspondence between Dr. Schultheis and Chambers showing that Dr. Schultheis is also an attorney and that he reviewed Chambers' medical records in 2010 to determine the viability of a medical malpractice claim. The defendants correctly point out that Dr. Schultheis does not offer any opinion as to *the defendants'* actions or omissions, and at best, Dr. Schultheis has testified to a negligence standard, not deliberate indifference.

### III.  Conclusion

Chambers has not identified a genuine issue of material fact as to his claim that Dr. Mitcheff and Dr. Talens were deliberately indifferent to his serious medical needs. Accordingly, the motion for summary judgment filed by these defendants [69] must be **granted.**

All claims have now been resolved against all defendants. Judgment consistent with this Entry and with the Entry of July 26, 2011, dismissing the claim against defendant Rose Vaisvilas, shall now issue.

**IT IS SO ORDERED.**

Date: 03/15/2012

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana